REVISED MARCH 9, 2010
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 22, 2010

Charles R. Fulbruge III
Clerk

No. 09-50208

_____

LINDSEY WAMPLER; MICHAEL J. PEACOCK,

Plaintiffs - Appellants

v.

SOUTHWESTERN BELL TELEPHONE COMPANY, doing business as
AT&T Southwest, doing business as AT&T Datacomm, doing business as
AT&T Texas; SBC ADVANCED SOLUTIONS, INC., doing business as AT&T
Advanced Solutions; AT&T, INC.; PARKMEED MALIBU CANYON LLC II;
PARKMEED MALIBU CANYON LLC; RICHARD H. MORAN; ROBERT S.
WELLS, as Trustee of the Wells Revocable Trust Dated July 2, 2002;
CHRISTA B. WELLS, as Trustee of the Wells Revocable Trust Dated July 2,
2002; CASTLE HILLS, L.P.; RENAISSANCE AT WEST AVENUE
APARTMENTS, L.P.; BUCA WEST AVENUE GENPAR, LLC; AT&T VIDEO
SERVICES, INC., doing business as AT&T Home Entertainment; GE-CWS
POOL, LLC,

Defendants - Appellees

_____

Appeal from the United States District Court for the
Western District of Texas
USDC No. 1:07-CV-1039

_____

Before REAVLEY, DAVIS, and STEWART, Circuit Judges.

REAVLEY, Circuit Judge:

Plaintiffs/Appellants sue for themselves and on behalf of a class of all residents of multiple dwelling units ("MDUs") in five states who are limited to voice, video, and Internet service by contracts with Defendant/Appellee AT&T. The claim is that a single MDU is itself a relevant geographic market and for that reason the contracts are in violation of § 1 of the Sherman Act.[1] The district court dismissed the case and we AFFIRM.

The owner of the MDU where Appellants live in San Antonio entered into contracts, whereby AT&T was granted the exclusive right to provide video, voice and broadband Internet ("Triple Play") services to MDU residents in exchange for AT&T paying a "door fee" to the MDU owners. The contract also provides AT&T with exclusive access to the copper wire, coaxial, and fiber optic cables entering the MDU, thereby granting AT&T exclusive control to the "bottleneck" through which all voice, video, and Internet services may enter the individual residences.

Appellants filed this suit to claim that Appellees violated §§ 1-2 of the Sherman Act because the contracts were both an illegal restraint on trade and an attempt to monopolize the Triple Play services market. The district court granted Appellees' motion to dismiss the case, holding that Appellants had failed to demonstrate that their alleged geographic market was sufficient for antitrust purposes.

We review a district court's ruling on a motion to dismiss de novo. See Apani Sw. Inc. v. Coca-Cola Enters.[2] Antitrust cases are not subject to a heightened pleading standard. Bell Atl. Corp. v. Twombly.[3] As in most cases, a plaintiff must provide "a short and plain statement of the claim showing that

---

[1] 15 U.S.C. § 1.

[2] 300 F.3d 620, 624 (5th Cir. 2002) (citing Jackson v. City of Beaumont Police Dep't, 958 F.2d 616, 618 (5th Cir. 1992))

[3] 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007).

the pleader is entitled to relief . . . in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."[4] "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the complaint's allegations are true."[5] Ultimately, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face."[6]

Appellants appeal only the district court's dismissal of their claims based on § 1 of the Sherman Act.[7] In order to demonstrate a violation of § 1, Appellants must allege that (1) AT&T and the Manor owners engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market.[8] The first step in this analysis is determining the relevant market, which itself is a function of the relevant product market and the relevant geographic market.[9]

Appellants have alleged, and Appellees have not disputed, that the relevant product market in this case is Triple Play services. The sole issue on appeal is whether a single MDU (or MDUs in the aggregate) may plausibly be considered a relevant geographic market for antitrust purposes.

---

[4] Id. at 555, 127 S. Ct. at 1964 (internal cites and quotes omitted).

[5] Id. at 555, 127 S. Ct. at 1965.

[6] Id. at 570, 127 S. Ct. at 1974.

[7] Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

[8] See Apani, 300 F.3d at 627 (citing Spectators' Comm. Network Inc. v. Colonial Country Club, 253 F.3d 215, 220 (5th Cir. 2001)).

[9] See id.

In defining the relevant geographic market, this Court looks at "the area of effective competition." Tampa Elec. Co. v. Nashville Coal Co.[10] This is the area "in which the seller operates and to which buyers can practicably turn for supplies."[11] In addition, the proposed market must "correspond to the commercial realities of the industry and be economically significant." Brown Shoe Co. v. United States.[12] These "commercial realities" include "size, cumbersomeness, and other characteristics of the relevant product" along with "regulatory constraints impeding the free flow of competing goods into an area, [such as] perishability of products, and transportation barriers."[13] When determining the "economic significance" of a proposed market, we look to whether the proposed market is "'largely segregated from, independent of, or not affected by' competition elsewhere."[14]

In Apani, we held that the bottled-water business on city-owned facilities in Lubbock, Texas, was not a plausible relevant market for antitrust purposes. Specifically, we affirmed the lower court's holding that bottled water was not limited by its size, cumbersomeness, or perishability to just the facilities owned by the city.[15] In addition, we affirmed the holding that bottled-water business on those facilities was not economically segregated or insulated from the sale of bottled water elsewhere in the city.[16] In the instant case, the district court relied

---

[10] 365 U.S. 320, 328, 81 S. Ct. 623, 628 (1961).

[11] Apani, 300 F.3d at 626 (citing Tampa Elec. Co., 365 U.S at 327, 81 S. Ct. at 628).

[12] 370 U.S. 294, 336-37, 82 S. Ct. 1502, 1530 (1962) (internal quotes omitted).

[13] Apani, 300 F.3d at 626 (citations omitted).

[14] Id. at 627 (quoting EARL W. KINTNER, FEDERAL ANTITRUST LAW: VOLUME IV THE CLAYTON ACT SECTION 3; SECTION 7; MERGERS AND MARKETS § 38.2 (1984)).

[15] Id. at 628-29.

[16] Id. at 629.

exclusively on this Court's ruling in Apani to conclude that Appellants' defined market of a single individual MDU was too narrowly drawn. By comparing the bottled-water business on city-owned facilities in Apani to the Triple Play services business in a single MDU, the district court determined that "Plaintiffs' alleged geographic market of MDUs essentially identifies specific venues (collections of apartment homes) that simply narrow the broader economic market in which these MDUs are located, which in this case is the City of San Antonio." We agree.

There are obvious physical differences between an easily portable bottle of water and the home-bound Triple Play services, such that the commercial realities facing consumers of each product are different. However, we hold that there are too many competitive forces bearing on a SmartMoves contract for a single MDU to be sufficiently isolated and thus economically significant. First, it is undisputed that MDUs compete with each other for a tenant's business. Accordingly, an MDU owner has an incentive to provide the lowest cost and highest quality services to attract a tenant's business. Second, it is also undisputed that service providers such as AT&T compete with each other to provide the Triple Play contracts in each MDU. It is therefore in the interest of each service provider to provide lower-cost and higher-quality services than its competitors in order to attract the MDU's business. Finally, when a tenant signs a lease, that tenant has the opportunity to inquire into what services are available at the MDU. Therefore, the cost and quality of Triple Play services likely play a factor in where a tenant chooses to live. If a tenant does not like the services of a particular MDU, that tenant can make other living arrangements. See Hack v. President & Fellows of Yale Coll.[17] Even if these

---

[17] 237 F.3d 81, 87 (2d Cir. 2000) (noting that if students forced to live on campus did not like their living facilities, "they could matriculate elsewhere"), abrogated on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S. Ct. 992 (2002).

SmartMoves contracts were imposed in the middle of a particular tenant's lease,[18] the modern leasehold rarely lasts more than a year, and a tenant is therefore "locked in" to these services only for a brief time. Accordingly, given the competition that exists between MDU owners, the competition that exists between service providers, and given the highly mobile nature of today's society, we cannot hold that a single MDU is so segregated as to be economically significant and thus represents a plausible geographic market.[19]

Appellants have failed to properly allege a relevant geographic market and their § 1 claim fails.

AFFIRMED.

---

[18] Despite making such arguments in their briefs, Appellants made no allegations in their complaint that any of them were "locked in" to SmartMoves contracts mid lease.

[19] Appellants also point to various reports by the Federal Trade Commission declaring that contracts similar to the SmartMoves contract result in higher costs and lower quality services for MDU residents. Such reports do little to support Appellants' argument on appeal. As Appellees point out and Appellants apparently concede, these reports provide no definition of a relevant geographic market, because such an antitrust-specific definition is not directly relevant to the FTC reports. While the FTC's conclusions are informative regarding the anticompetitive nature of certain behavior, those conclusions are not dispositive of whether an antitrust violation has occurred. See, e.g., Goldwasser v. Ameritech Corp., 222 F.3d 390, 399-400 (7th Cir. 2000) (violations of FTC enabling statutes do not equate with violations of antitrust laws).